UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PETER MAKRIS and ANNA MAKRIS, as
legal guardians of S.M.,

                Plaintiffs,

  -against-

THE ARC WESTCHESTER; SONIA
JARRETT; JAMARIS RHODES;
ROSEMARIE DOE; SOPHIE DOE; BRIE
DOE; ANDREA DOE; FLORENCE DOE;
LAVENDER DOE; ORIANA DOE; SASHA
DOE; and ALIYAH DAWSON,

                Defendants.

No. 22 Civ. 9604

**COMPLAINT AND
JURY DEMAND**

       Plaintiffs Peter and Anna Makris, as legal guardians of S.M., by and through their

attorneys Kaufman Lieb Lebowitz & Frick, allege as follows:

**PRELIMINARY STATEMENT**

       1.     As service providers for people with disabilities, Defendants are entrusted

with the safety, protection, and well-being of individuals who need help with basic

activities of daily living.

       2.     When Peter and Anna Makris placed their daughter S.M. at the Foxhall

Residence IRA, operated by the Arc of Westchester, they expected that Defendants

would care for S.M. with respect and in a supportive living environment.

       3.     Instead, Defendants subjected S.M. to staggering levels of abuse,

harassment, and neglect.

       4.     S.M. is a 35-year-old woman living with cerebral palsy and other

disabilities that cause her to use a wheelchair. She requires assistance with mobility,

toileting, and bathing.

5. Because of these disabilities, Defendants treated S.M. with neglect and disdain, blaming her for her incontinence and punishing her for her inability to care for herself.

6. On one occasion, Defendants refused to assist S.M. as she transferred from her wheelchair to an unauthorized transport van, forcing her to crawl on a hard metal floor and sustain serious trauma to her foot. Defendants then failed to treat S.M.'s foot injury, causing it to become severely infected. S.M. only received the treatment she desperately needed after sending her parents photos of the horrendous injury.

7. She was hospitalized for five days.

8. Even after subsequent meetings between S.M.'s parents and Arc staff concerning appropriate transport procedures, Defendants continued to defy directives and to force S.M. to pull her own body into inaccessible vans, causing extensive pain and bruising to her legs.

9. S.M. also endured a constant barrage of staff behavior designed to humiliate and shame her for her disabilities.

10. Defendants openly refused to assist S.M. with wiping after urinating and defecating, leaving S.M. at risk of infection and living uncomfortably in her own filth. They ignored S.M. when she said she needed to use the bathroom, only to berate and punish her when she could not control her bladder. Defendant Rosemarie Doe refused to remove S.M. from a clogged and overflowing toilet, causing her to remain helpless in contaminated toilet water. Defendant Jamaris Rhodes sprayed freezing cold water directly at S.M.'s vagina, causing her to scream and cry in pain. Defendants also purposefully left S.M.'s door open when she was undressed and showering and made

sexually inappropriate comments concerning her inability to wipe and clean her vaginal and rectal areas.

11.     In short, Defendants degraded and dehumanized S.M.

12.     S.M. now seeks justice and accountability for Defendants' shocking disregard for her dignity and rights.

## JURISDICTION AND VENUE

13.     This action arises under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*; the Rehabilitation Act, 29 U.S.C. § 794; the Affordable Care Act, 42 U.S.C. § 18116; the New York State Human Rights Law, N.Y. Executive Law § 290 *et seq.*; and the common law of New York.

14.     The Court has subject matter jurisdiction over Plaintiff's federal claims under 28 U.S.C. §§ 1331 and 1343(a). The Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367(a).

15.     Venue lies in the Southern District of New York under 28 U.S.C. § 1391(b)(1) because Defendant the Arc Westchester resides in Westchester County within the meaning of 28 U.S.C. § 1391(c)(2) and all events giving rise to the claims occurred in this judicial district.

## PARTIES

16.     Plaintiff S.M. is a 35-year-old disabled woman who appears in this action by and through her legal guardians, Peter and Anna Makris. S.M. resided at the Foxhall Residence IRA[1] ("Foxhall") in Scarsdale, New York from October 2015 to January 2021. She currently resides at her parents' home in New York state.

---

[1] An IRA, or "individual residential alternative," is a group home for people with developmental disabilities. IRAs are certified and regulated by the New York State Office for People with Developmental Disabilities ("OPWDD") and operated by either OPWDD

17.     Peter Makris is S.M.'s father and legal guardian. He is a resident of New York state.

18.     Anna Makris is S.M.'s mother and legal guardian. She is a resident of New York state.

19.     Defendant Arc of Westchester ("Arc") is a 501(c)(3) organization organized under the laws of New York with its principal place of business in Hawthorne, New York. Arc managed Foxhall at all relevant times under OPWDD operating certificate number 60010451. Arc is a chapter of NYSARC, Inc. ("The Arc of New York").

20.     Defendant Sonia Jarrett was at all relevant times a House Manager at Foxhall and an employee of Arc.

21.     Defendant Jamaris Rhodes was at all relevant times an Assistant House Manager at Foxhall and an employee of Arc.

22.     Defendant Rosemarie Doe was at all relevant times a staff member at Foxhall and an employee of Arc. Plaintiff has been unable to determine Defendant Rosemarie Doe's last name.

23.     Defendant Sophie Doe was at all relevant times a staff member at Foxhall and an employee of Arc. Plaintiff has been unable to determine Defendant Sophie Doe's last name.

24.     Defendant Brie Doe was at all relevant times a staff member at Foxhall and an employee of Arc. Plaintiff has been unable to determine Defendant Brie Doe's last name.

---

or private agencies who assume responsibility for providing staffing and services to supervise and support residents.

25.     Defendant Andrea Doe was at all relevant times a staff member at Foxhall and an employee of Arc. Plaintiff has been unable to determine Defendant Andrea Doe's last name.

26.     Defendant Florence Doe was at all relevant times a staff member at Foxhall and an employee of Arc. Plaintiff has been unable to determine Defendant Florence Doe's last name.

27.     Defendant Lavender Doe was at all relevant times a staff member at Foxhall and an employee of Arc. Plaintiff has been unable to determine Defendant Lavender Doe's last name.

28.     Defendant Oriana Doe was at all relevant times a staff member at Foxhall and an employee of Arc. Plaintiff has been unable to determine Defendant Oriana Doe's last name.

29.     Defendant Sasha Doe was at all relevant times a staff member at Foxhall and an employee of Arc. Plaintiff has been unable to determine Defendant Sasha Doe's last name.

30.     Defendant Aliyah Dawson was at all relevant times an employee of the Arc Day Program.

## JURY DEMAND

31.     Plaintiffs demand a jury trial.

## FACTUAL ALLEGATIONS

### I.     S.M. Seeks Supportive Living Services at Foxhall

32.     S.M. is a bright and motivated 35-year-old woman who verbally expresses herself in a clear and direct manner.

33.     She is also severely disabled.

34.     S.M. lives with cerebral palsy, scoliosis, and significant physical impairments resulting from the more than 40 surgeries she has received, most of them brain surgeries, including a rhizotomy and spinal fusion.

35.     She uses a wheelchair and has limited range of motion: she is unable to bend at the waist, reach underneath her body, or spread her legs.

36.     Because part of the nerve that controls her bladder was cut during one of her surgeries, S.M. experiences urinary and fecal incontinence.

37.     Given these limitations, S.M. requires routine assistance with bathing, toileting, dressing, and mobility. Throughout her time at Arc, she relied on Arc staff to provide this assistance.

38.     In October 2015, S.M.'s parents and guardians, Peter and Anna Makris, placed S.M. at Arc's Foxhall Residence.

39.     Arc received federal financial assistance to fund its programs, including the programs at Foxhall.

40.     For example, S.M.'s own Supplemental Security funds were used to pay her room and board at Foxhall.

41.     Upon information and belief, Arc received reimbursements from Medicaid for services it provides at Foxhall, including services provided to S.M.

42.     OPWDD regulations require that service recipients living in IRAs like S.M. be given Individualized Protective Oversight Plans ("IPOPs") to identify risks to the individual as well as strategies and methods that service providers will use to safeguard the individual and minimize those risks.

43.    At Arc, staff worked with S.M. and her parents to create plans for her care, including an IPOP. Her IPOP was routinely reviewed and revised, as necessary, and at least every year.

## II.    Defendants Routinely Neglect and Mistreat S.M.

44.    By July 2018, Mr. and Ms. Makris began to receive alarming signs that the very staff entrusted with S.M.'s care and livelihood were instead actively harming her through appalling acts of abuse and neglect.

### A.    *Defendants' Mistreatment Causes S.M. to Sustain a Serious Foot Injury, Resulting in a 5-Day Hospitalization*

45.    On July 31, 2018, S.M. sent her parents a distressing photo of her right foot that had become so severely infected that it was barely recognizable as a foot.

46.    The skin below S.M.'s ankle was red and purple, and her foot had ballooned to almost twice its normal size, as depicted in the photograph she sent, reproduced below:



47.     S.M. was suffering from cellulitis, a serious bacterial skin infection.

48.     The infection resulted from a significant injury S.M. had sustained when Arc staff had forced her to enter a non-accessible van that could not accommodate her wheelchair, in direct violation of her IPOP.

49.     As documented in the IPOP that had been developed, implemented, and reviewed by Arc staff three months prior to the injury, S.M. required a wheelchair-accessible van to accommodate the motorized wheelchair she uses.

50.     If a wheelchair accessible van was unavailable, S.M.'s IPOP required that Arc staff provide her with a car and assist her with transfer into the vehicle.

51.     Staff were specifically directed to place the wheelchair facing the seat of the car as close to the vehicle as possible, so that S.M. could lift, turn, and lower herself into the car's seat.

52.     S.M. is only able to navigate this procedure in transferring to a car, and not a van, because a car seat is lower than that of a van.

53.     Because S.M. was the only Foxhall resident who used a wheelchair, all staff were specifically instructed on her transport needs.

54.     Staff resented making special accommodations for S.M., the only resident who used a wheelchair and required an accessible van.

55.     On this occasion, staff blatantly ignored S.M.'s IPOP and insisted on using an inaccessible van.

56.     Because S.M. could neither enter with her wheelchair nor transfer herself into the van, Arc staff forced S.M. to crawl from her wheelchair to the hard metal floor of the van before raising herself onto the van's chair.

57.     During this transfer, S.M. sustained trauma to her foot resulting in swelling and an abrasion.

58.     S.M. was bruised and bleeding, but staff failed to treat her injury.

59.     In fact, over the next several days, staff failed to document or treat her injury in any way.

60.     Given that all female staff, including Defendants Jarrett and Rhodes, bathed and dressed S.M. multiple times daily, it is inconceivable that no staff member noticed S.M.'s infection develop and spread throughout her foot.

61.     Yet not a single staff member reported S.M.'s injury to Mr. or Ms. Makris.

62.     Desperate to receive treatment for her increasingly concerning infection, S.M. finally sent a photo of her foot to her parents.

63.     Upon receiving S.M.'s message, Mr. and Ms. Makris urgently contacted an Arc nurse Diane Kurzer to ensure their daughter be seen and treated.

64.     S.M.'s injury ultimately required a five-day hospitalization, wherein she underwent several tests and a needle aspiration procedure to remove excess blood from her foot, and then spent multiple days in recovery.

65.     When Mr. and Ms. Makris arrived at the hospital, S.M. confided in them that she was terrified of what would happen to her when she returned to the Arc home.

66.     No Arc employee checked in on S.M. or inquired about her progress during her hospital stay.

67.     When S.M. was approved to be discharged from the hospital, Jarrett claimed that no staff member could be available to pick S.M. up from the hospital for the next two days.

68.     Despite knowing about her impending discharge, Jarrett failed to make any arrangements to bring S.M. back to Foxhall.

69.     S.M. avoided two additional unnecessary days at the hospital only because her parents promptly picked her up and returned her to their non-accessible home.

70.     In advance of S.M.'s return to Foxhall, Ms. Makris called Foxhall administrators to inform them of supplies S.M. needed to treat her wounds, according to her discharge instructions, including specific sizes and types of bandages.

71.     When S.M. was brought back to Foxhall, staff had ignored the instructions and did not have adequate supplies.

### B. *S.M. Suffers Severe Bruising and Trauma to her Legs as a Result of Defendants' Neglect*

72.     After S.M.'s hospitalization, Mr. and Ms. Makris communicated with nurse Kurzer, Defendant Jarret, and Arc administrators through emails and in-person meetings to ensure that Arc staff would not continue to injure S.M. through their improper transport procedures.

73.     Mr. and Ms. Makris reiterated that the terms of S.M.'s IPOP required that she be transported only in a wheelchair-accessible van or, if that is unavailable, a car.

74.     After S.M.'s foot injury, Arc administrators added extra language to her IPOP emphasizing that, in the event the wheelchair-accessible van was not available, she must be transferred by car—"not a van."

75.     Yet staff routinely failed or refused to provide this necessary accommodation.

76.     In March 2019, not even a full year after her hospitalization, S.M. sustained additional physical injuries after staff *again* ignored her IPOP with respect to transport procedures.

77.    For several weeks, S.M. was forced to crawl into a non-accessible van multiple times per day.

78.    Upon information and belief, staff, including Defendant Aliyah Dawson, forced S.M. to crawl into a non-accessible van because they resented having to make special accommodations required by her physical disabilities.

79.    Defendants repeatedly stood by as S.M. transferred herself with great difficulty into a vehicle previously determined to be unsafe for her.

80.    As she dragged her body into the van, S.M.'s legs forcefully slammed into the hard metal stairs leading into the van and the floor of the van.

81.    During this humiliating and deeply painful process, S.M. sustained severe bruising up and down her legs.

82.    Arc staff again failed to document S.M.'s injuries or to alert S.M.'s parents about her physical suffering.

83.    After S.M. told her parents she had again been required to crawl into the non-accessible van and that her legs were bruised and hurting, Mr. Makris immediately called Arc.

84.    The staff member responsible for Arc's transportation operations, Marc Doe, informed S.M.'s parents that Arc would stop transferring her in the non-accessible van.

85.    Two days after the phone call, S.M.'s parents brought her home for a routine visit and were appalled to see the full extent of the bruising down the front, back, and sides of S.M.'s legs, as depicted in this photograph:



86.     At the time of these injuries, Arc staff was bathing, dressing, and toileting S.M. every day, making it unfathomable that her injuries were unnoticed.

87.     Just as before, however, not a single staff member reported S.M.'s injuries to Mr. or Ms. Makris.

### C. *Arc Employees Neglect S.M.'s Hygiene and Verbally Abuse Her*

88.     As S.M.'s caretakers, Defendants were required to undertake specific actions to assist S.M. with toileting and genital hygiene, actions necessary because of S.M.'s particular disabilities.

89.     Instead of carrying out these duties, Defendants regularly humiliated and denigrated S.M. for her bodily functions that her disabilities left her unable to fully control, left her in her own feces and urine, verbally abused her, and humiliated her by suggesting that she derived sexual pleasure from the toileting procedures outlined in her IPOP.

90.     As set out in S.M.'s IPOP, Arc staff were required to wipe her genitals following a urinary accident, menstruation, or use of the toilet. This was necessary because S.M. was unable to bend at the waist, reach behind herself, or spread her legs.

91.     Specifically, the IPOP instructed staff, after a urinary accident, to change S.M.'s pull-ups, use a soapy washcloth to clean all urine and/or menstrual blood from her skin, and rinse her using a clean, wet washcloth or a squeegee bottle filled with warm water.

92.     While S.M. used the toilet, the IPOP required staff to give her five minutes of privacy during which time they were expected to stand outside of the bathroom door. S.M. would then tell staff when she was finished, prompting the staff member to come in and assist her with post-toileting.

93.     If S.M. did not call out that she was finished, staff were directed by the IPOP to check in on S.M. every five minutes until she told them that she was finished.

94.     Because of the nature of S.M.'s disabilities, Arc staff were also required to assist S.M. with rinsing and cleaning during showering and were specifically instructed to ensure that her rectal and vaginal areas were cleaned well.

95.     Beginning in early 2019, Defendants and other Arc employees began to regularly ignore these directives, leaving S.M. in shocking and mortifying circumstances.

>        i.   <u>Arc Staff Refuse to Wash and Wipe S.M.'s Vagina and Rectum, In
>             Violation of Her IPOP</u>

96.     On dozens of occasions, Arc staff members, including Defendants Jarrett, Rhodes, Sophie, Brie, Andrea, Florence, Lavender, Oriana, and Sasha refused to wipe S.M. during toileting and wash her vaginal and rectal areas during showering.

97.     Defendants and other Arc staff members frequently and openly expressed their contempt for S.M. and her disabilities while refusing to abide by her IPOP.

98.     For example, on June 13, 2020, while showering S.M., Rhodes told her, "I am not going to wash your private areas, you can do them yourself."

99.     Defendant Rhodes knew that S.M.'s disabilities prevented her from being able to wash herself.

100.    Florence Doe frequently refused to clean S.M. and on one occasion failed to wash her while she was in the middle of her menstrual cycle, leaving S.M. in a bloody mess.

101.    Andrea Doe refused to wash S.M. with such frequency that it became the subject of another staff member's complaint. In mid-2020, a staff member who had just begun their shift went to clean S.M. only to find that S.M. had been made to sit in a mess of her own fecal matter because of Andrea's refusal to wash S.M.

102.    On October 1, 2020, S.M.'s mother asked Andrea to follow S.M.'s IPOP and wash her. Andrea responded: "No, I'm not going to do that. [S.M.] can wash her own vagina."

103.    On other occasions, Defendants feigned busyness or even hid from S.M. to avoid toileting or bathing her.

104.    These actions openly defied S.M.'s IPOP, left her unclean and at risk of infection, and caused her to feel distressed, shameful, and fearful.

           ii.   Defendants Shame, Embarrass, and Verbally Abuse S.M.

105.    Defendants frequently used harassing and accusatory language against S.M. and shamed her about ordinary bodily functions—and the disability that prevented her from always fully controlling those functions.

106.    Sonia Jarrett called S.M. the "devil," a "demon," "evil," a "piece of shit," "ungrateful," "manipulative," "rude," "disrespectful," and a "liar."

107.    S.M. also overheard Andrea Doe describing S.M. as a "piece of shit" to other staff members on multiple occasions.

108.    Rosemarie Doe would frequently become angry with S.M. and yell at her for needing assistance with basic tasks, including removing her slippers, which S.M. was unable to do as a result of her disabilities, predominantly her scoliosis

109.    Defendants would single out, berate, disparage S.M. for making harmless mistakes related to her physical disabilities. For example, S.M. was forced to balance her plate and utensils on her lap from the dining area to the kitchen, and when they would occasionally slide off her lap onto the floor staff would criticize and vilify her, accusing S.M. of purposefully dropping them.

110.    In August 2020, when S.M. asked Rhodes to wear a surgical mask in accordance with Arc's Covid-19 safety protocols, Rhodes responded: "A person in diapers is telling me what to do," and repeated that statement to another staff member.

111.    Because of her disabilities, S.M. would frequently inadvertently have bowel movements or pass gas in front of Defendants, who responded by accusing S.M. of doing so deliberately.

112.    Defendants routinely ignored S.M.'s requests to be taken to the bathroom, frequently delaying for so long that S.M. would have a urinary accident.

113.    Florence Doe frequently failed to take S.M. to the bathroom, often forcing her to urinate on herself.

114.    Sasha Doe also regularly refused to toilet S.M., causing her to oversaturate her pull-up and leak urine onto her clothes and wheelchair cushion. Sasha continued to refuse to toilet S.M. even after Mr. and Ms. Makris complained to Arc administrators about this mistreatment.

115.    Several Defendants, including Sophie Doe, would slam doors at S.M. in anger at her for wetting herself, despite that she made S.M. wait so long she could no longer hold her bladder. On one occasion, S.M. called her parents hysterically crying because Sophie had screamed at S.M. for wetting herself: "WHY DID YOU WAIT TO ASK TO GO TO THE BATHROOM?"

116.    Defendants also implemented repulsive "punishments" for S.M.'s disability-related behaviors. For example, in April 2020, Arc staff punished S.M. by refusing to clean feces from her bathroom floor, forcing her to use the soiled bathroom for almost 24 hours.

                iii.  <u>Defendants Sexually Harass S.M.</u>

117.    On more than one occasion, Defendants placed S.M. in situations that exposed her naked genitals to other staff members and housemates.

118.    When S.M. was taken to the bathroom or shower, Defendants frequently forgot to lock the door from her room to the public areas, leaving S.M. exposed when other staff members or peers opened the door.

119.    Embarrassed by this exposure, S.M. asked staff to lock the door to the bathroom and raised the issue with her parents, who spoke directly to Arc administrators.

120.    After hearing that S.M. had complained, Jarrett and Rhodes began to deliberately leave the door open so others, including male staff and housemates, could see her naked body.

121.    This vulgar and vindictive behavior left S.M. feeling defenseless and debased.

122.    Defendants also directed sexually inappropriate comments at S.M.

123.    On October 18, 2020, when S.M. needed washing following a urinary accident, Rosemarie told her, "I am not going to touch your vagina. You can do it by yourself, and you can enjoy yourself."

124.    On November 8, 2020, Rosemarie refused to wipe S.M. according to her IPOP, announcing loudly, "Just because one staff member cleaned your front and gave you pleasure [. . .] I'm here to do a job and not to give you pleasure."

125.    On January 8, 2021, when showering S.M., Oriana refused to wash S.M.'s vaginal area, despite that S.M. told her she was menstruating. Oriana responded: "I am well aware, but I don't want any complaints about playing with you."

      iv.  <u>Rosemarie Ignores S.M.'s Pleas to Remove Her From an Overflowing Toilet</u>

126.    Arc employees also frequently left S.M. on the toilet for long periods of time while failing to check on her or even respond to her cries for help.

127.    As a result, S.M. was often left on the toilet crying well after she had finished a bowel movement.

128.    On July 25, 2020, Rosemarie placed S.M. on a clogged toilet which began to overflow while S.M. was sitting on it.

129.    S.M. desperately called out for Rosemarie to remove her from the overflowing toilet, but Rosemarie ignored her calls while she mopped the floor around S.M.

130.    When Rosemarie finally removed S.M. from the toilet, S.M. was covered in a considerable mess.

131.    Rosemarie continued her sadistic mistreatment of S.M., by placing S.M.'s pull-ups on her without wiping or cleaning her, forcing S.M. to spend the rest of the day sitting in her own waste.

v. <u>Jamaris Rhodes Causes Freezing Cold Water to be Sprayed on S.M.'s Vagina</u>

132. In May 2020, then-Assistant House Manager Jamaris Rhodes caused S.M. considerable embarrassment and pain while assisting her with post-toileting cleaning.

133. She aimed a shower head between S.M.'s legs and told her to hold it so that it was positioned to spray directly onto her vagina.

134. Rhodes then turned on freezing cold water.

135. Instead of ensuring the water was warm, as required by her IPOP (and common decency), Rhodes spitefully caused the icy stream to shoot at S.M.'s most sensitive areas.

136. S.M. jumped and cried in pain and discomfort.

**III. DRNY Investigation Confirms Widespread Abuse and Neglect**

137. Mr. and Ms. Makris contacted Disability Rights New York ("DRNY") to request that the organization independently investigate Arc's treatment of S.M. at Foxhall.

138. DRNY is a federally- and state-authorized protection and advocacy agency for people with disabilities in the state of New York, which conducts investigations of complaints of abuse, neglect, and rights violations of service recipients like S.M.

139. DRNY reviewed Arc's internal investigation documents concerning the suspected abuse and neglect of S.M., including Ms. Fields' notes and the electronic files created as part of the investigation.

140. After conducting its review, DRNY found "disturb[ing]" evidence demonstrating that Arc staff repeatedly refused to follow S.M.'s IPOP and abused S.M. by treating her with hostility and villainizing her for her disability-related behaviors.

141.    DRNY noted that Arc staff "openly disagreed" with the provisions of S.M.'s IPOP requiring staff to wash her vaginal area: One staff member expressed that the requirement was "not pleasant," another incorrectly insisted that S.M. could wash her own genitals, and several staff members stated aloud in staff meetings that they *refused* to comply with the directive.

142.    As DRNY found, S.M. reported multiple times that, due to her disabilities, she could not clean her vaginal area properly, but that staff failed to wash her.

143.    DRNY's report described that S.M. was forced to deal with Arc "staff['s] open resistance and even hostility towards assisting [her]" every day, noting that the employees' actions transformed "what should be a simple hygiene routine . . . into a daily ordeal."

144.    DRNY detailed that Arc staff created a "toxic atmosphere" for S.M. by making S.M. feel shame for bodily functions that were beyond her control: "No individual should be made to feel as though they have done something wrong because she could not control a bowel movement. [S.M.] depends on these staff for assistance with intimate activities of daily life. Under these circumstances, basic standards of care require that staff not assume malice in these situations."

145.    Although staff members were expected to exhibit kindness and patience toward S.M., DRNY found that a "a disturbing number of records" demonstrated that Arc staff instead attributed malicious intent to S.M. and "villainized" her for her disability-related behaviors such as her incontinence.

146.    The report also described that a lack of meaningful response by Arc allowed the staff's mistreatment of S.M. to persist unchecked: "It is unclear what consequences staff involved in such incidents have faced. This situation appears to have

been allowed to fester, and interviews concerning the incidents sometimes took place long after alleged events."

147.    In sum, DRNY found that Defendants' treatment of S.M. violated state administrative regulations guaranteeing service recipients freedom from physical or psychological abuse and support staff who are trained to administer services adequately, skillfully, safely, and humanely, with full respect for an individual's dignity and personal integrity.

### IV. S.M. Sustains Lasting Trauma

148.    Beginning in mid-2018, S.M. was frequently in tears during her phone calls and visits home as she described Defendants' abusive behavior.

149.    Mr. and Ms. Makris noted with increasing distress that S.M.'s mental state had begun to deteriorate.

150.    The constant verbal and physical abuse and neglect took an extreme toll on S.M, who could not understand why people who were supposed to care for and protect her were so cruel.

151.    According to Arc's own investigation, S.M. began to appear "stressed," "exasperated," on the "verge of crying," and defeated in tone and appearance.

152.    Unable to bear their daughter's suffering at Foxhall, Mr. and Ms. Makris brought S.M. to live at home on January 9, 2021.

153.    The mistreatment S.M. endured at Arc's Foxhall home has left her with enduring trauma that has altered her behavior and demeanor and continues to affect her today.

154.    Prior to her stay at Foxhall, S.M. was outgoing, loving, and cheerful.

155.     As a result of the emotional distress she suffered under Defendants' care, however, S.M. has become introverted, fearful, and guarded.

156.     Mr. and Ms. Makris noticed that after S.M. returned to their care, she became panicky and frantic any time she made a mistake such as dropping something on the floor, apologizing profusely and begging for forgiveness in an apparent trauma-related response to the beratement she had received for harmless mistakes at Foxhall.

157.     S.M. is less trusting of strangers and more guarded in the ways she acts and speaks.

158.     She struggles with feelings of shame around her toileting needs.

159.     Notwithstanding that S.M. would stand to benefit greatly from a placement at another residential program to serve her various social-environmental needs, particularly as Mr. and Ms. Makris age and contend with their own health-related challenges, S.M. is deeply fearful that she will experience similar levels of abuse and neglect and has not yet been able to enroll in such a program.

## FIRST CAUSE OF ACTION
### Section 504 of the Rehabilitation Act – 29 U.S.C. § 794
### Against Defendant Arc

160.     Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth at length herein.

161.     The Rehabilitation Act prohibits entities that receive federal financial assistance from discriminating against people with disabilities. 29 U.S.C. § 794a.

162.     The Rehabilitation Act applies to Defendant's programs and activities, because Arc receives federal financial assistance, including through the Medicaid program.

163.    The Rehabilitation Act requires, inter alia, that Defendant administer its programs in a manner that does not discriminate against people with disabilities and provide people with disabilities equal access to benefits and services.

164.    Defendant discriminated against Plaintiff on the basis of her disability by subjecting her to disparate treatment and pervasive and severe harassment on the basis of her specific physical disabilities. Defendant singled Plaintiff out for mistreatment because of the nature of her disabilities.

165.    Defendant is required to make reasonable accommodations in policies, practices, or procedures when accommodations are necessary to avoid discrimination on the basis of disability. 29 U.S.C. § 794; 24 C.F.R. §§ 8.3, 8.4, and 8.20.

166.    Defendant failed to make reasonable accommodations for S.M.'s specific physical disabilities, including but not limited to ensuring access to a wheelchair-accessible van.

167.    At all times material to this action, Defendant Arc received federal financial assistance to operate programs and activities through and at the Foxhall Residence.

168.    S.M. is an otherwise qualified individual with a disability.

169.    As a direct and proximate result of this unlawful discrimination, S.M. sustained the damages herein alleged.

170.    Plaintiff is therefore entitled to compensatory damages, injunctive relief, and reasonable attorney's fees, including litigation expenses and costs. 29 U.S.C.A. § 794a.

## SECOND CAUSE OF ACTION
### Fair Housing Act – 42 U.S.C. § 3604
### Against All Defendants

171.    Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth at length herein.

172.    Defendants' conduct as hereinbefore described constitutes unlawful discrimination in the provision of services or facilities in connection with a dwelling because of disability, including by creating a hostile housing environment, in violation of the Fair Housing Act, 42 U.S.C. § 3604(f)(2). Defendants subjected Plaintiff to disparate treatment and pervasive and severe harassment on the basis of her specific physical disabilities. Defendant singled Plaintiff out for mistreatment because of the nature of her disabilities.

173.    Defendants' conduct as hereinbefore described further violated the law by effectively rendering the facility unavailable to S.M., forcing her to move out, in violation of 42 U.S.C. § 3604(f)(1).

174.    Defendant's conduct, as described above, constitutes discrimination against persons with handicaps by refusing to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling in violation of Section 804(f)(3)(B) of the Fair Housing Act, 42 U.S.C. § 3604(f)(3)(B).

175.    S.M. is an aggrieved person as defined by 42 U.S.C. § 3602(i).

176.    The unlawful discrimination carried out by the Defendants was intentional, willful, and done in reckless disregard for the rights of others, entitling S.M. to actual and punitive damages.

177.    Defendant Arc is vicariously liable to S.M. for the discriminatory housing practices of its employees pursuant to 24 C.F.R. § 100.7(b).

**THIRD CAUSE OF ACTION**
**Section 1557 of the Affordable Care Act – 42 U.S.C. § 18116**
**Against Defendant Arc**

178.    Section 1557 of the Affordable Care Act ("ACA") prohibits discrimination on the basis of disability in any health program or activity that receives any federal financial assistance. 42 U.S.C. § 18116(a) (referencing and incorporating the legal standards and enforcement mechanisms available under Section 504 of the Rehabilitation Act); 45 C.F.R. § 92.4 (definitions); 45 C.F.R. § 92.301 (enforcement mechanisms).

179.    Section 1557 applies to Defendant Arc because it administers health programs or activities and receives federal financial assistance through the Medicaid program. C.F.R. § 92.4 (defining "federal financial assistance" to include Medicaid reimbursement and defining "health program or activity" to include a "residential or community-based treatment facility, or other similar entity").

180.    Among other things, Section 1557 requires that Arc administer its programs in a manner that does not discriminate on the basis of disability and that Arc provide all individuals they serve with equal access to benefits and services, irrespective of the nature or severity of their disability.

181.    Arc's conduct as hereinbefore described discriminated against Plaintiff S.M. in the provision of benefits and services, in violation of Section 1557 of the ACA and Section 504 of the Rehabilitation Act.

182.    Defendant is also required to make reasonable accommodations in policies, practices, or procedures when accommodations are necessary to avoid discrimination on the basis of disability. 45 C.F.R. § 92.205.

183.    Defendant failed to make reasonable accommodations for S.M.'s specific physical disabilities, including but not limited to ensuring access to a wheelchair-accessible van.

184.    S.M. is an "aggrieved" person under Section 1557 and has been injured by Defendant's discriminatory conduct and has suffered damages as a result. 42 U.S.C. § 18116(a); 45 C.F.R. § 92.301(a).

185.    As a direct and proximate result of Defendant's conduct, S.M. sustained damages as herein alleged.

186.    Plaintiff is therefore entitled to compensatory damages, injunctive relief, and reasonable attorney's fees, including litigation expenses and costs. 42 U.S.C. § 18116(a); 45 C.F.R. § 92.301(b).

**FOURTH CAUSE OF ACTION**
**New York State Human Rights Law – N.Y. Executive Law § 296**
**Against All Defendants**

187.    Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth at length herein.

188.    At all times relevant hereto, the Foxhall Residence was a "housing accommodation" as defined by N.Y. Executive Law § 292(10) and a "publicly-assisted housing accommodation" as defined by N.Y. Executive Law § 292(11).

189.    At all times relevant hereto, Defendants acted as the Foxhall Residence's owner, lessee, sub-lessee, assignee, and/or managing agent, or were agents and/or

employees thereof or of the person or entity having the right to sell, rent, or lease a housing accommodation.

190.    S.M. is disabled within the meaning of the New York State Human Rights Law.

191.    The acts and omissions of the Defendants as herein described, including without limitation subjecting Plaintiff to disparate treatment and pervasive and severe harassment on the basis of her specific physical disabilities, singling Plaintiff out for mistreatment because of the nature of her disabilities, and failing to make reasonable accommodations for her disabilities, constituted discrimination against S.M. because of disability in the furnishing of facilities or services in connection with S.M.'s occupancy at the Foxhall Residence, and/or aided, abetted, incited, compelled, and/or coerced said discrimination. In addition, Defendants' acts rendered the Foxhall Residence effectively unavailable to S.M.

192.    As a direct and proximate result of this discrimination, S.M. sustained the damages herein alleged.

193.    Defendant Arc is vicariously liable to S.M. for the unlawful discriminatory practices of its employees.

**FIFTH CAUSE OF ACTION**
**Negligence – New York Common Law**
**Against All Defendants**

194.    Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth at length herein.

195.    Defendants owed a duty of care to S.M. as a Foxhall resident.

196.    Defendants breached the duty of care that they owed to S.M. by allowing her to be abused and neglected, failing to provide S.M. with necessary and proper care

and supervision, abusing and neglecting S.M., failing to detect and remedy the abuse and neglect of S.M., failing to intervene in the abuse and neglect of S.M. by others, and failing to properly supervise one another.

197.   Defendants additionally breached the duty of care that they owed to Plaintiff through their negligent supervision of S.M. and their negligent hiring, supervision, training, discipline, and retention of staff at the Foxhall Residence

198.   This breach of the duty of care was the proximate cause of S.M.'s serious and unnecessary injuries as herein described.

199.   As a direct and proximate result of the misconduct and abuse of authority detailed above, S.M. sustained the damages herein alleged.

200.   Arc is vicariously liable to S.M. for the tortious conduct of its employees.

201.   Arc is also liable under the doctrine of *res ipsa loquitur* because S.M., a disabled person, was harmed while in the Defendants' exclusive care and custody.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request judgment against Defendants as follows:

A.    Compensatory damages in an amount to be determined at trial;

B.    Punitive damages in an amount to be determined at trial;

C.    Reasonable costs and attorneys' fees;

D.    Pre- and post-judgment interest to the fullest extent permitted by law; and

E.    Any additional relief the Court deems just and proper.

Dated:        November 10, 2022
              New York, New York

                                        KAUFMAN LIEB LEBOWITZ &
                                        FRICK LLP


                                        _____/s/_____
                                        Alison Frick
                                        Alyssa Isidoridy

                                        18 E. 48th Street, Suite 802
                                        New York, New York 10017
                                        (212) 660-2332
                                        africk@kllf-law.com
                                        aisidoridy@kllf-law.com

                                        *Counsel for Plaintiffs*